**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Chief Judge Marcia S. Krieger**

**Civil Action No. 03-cv-01424-MSK-MEH**

**KENT ERIC LEBERE,**

    **Applicant,**

**v.**

**TRAVIS TRANI, Warden, and**
**THE ATTORNEY GENERAL OF COLORADO OF COLORADO,**

    **Respondents.**

_____

**ORDER ADOPTING RECOMMENDATION TO DENY**
**AMENDED APPLICATION FOR WRIT OF HABEAS CORPUS**
_____

**THIS MATTER** comes before the Court pursuant to the Applicant's Objection **(# 168)** to the Magistrates Judge's August 8, 2016 Recommendation **(# 167)** that the Applicant's Amended Application for Writ of Habeas Corpus brought Pursuant to 28 U.S.C. § 2254 **(# 62)** be denied.

## JURISDICTION

The Court exercises jurisdiction over this matter pursuant to 28 U.S.C. § 2254 and 28 U.S.C. § 1331.

## BACKGROUND[1]

Early in the morning of October 16, 1998, Linda Richards was murdered. Her killer left her body in her minivan and set the minivan on fire. Passersby saw the fire and contacted the police. After an investigation, the police arrested the Applicant, Kent Eric LeBere, and he was

---

[1] Pertinent facts are addressed in greater detail within the Court's analysis.

1

charged with three alternative counts of first-degree murder and one count of second-degree arson in El Paso County, Colorado District Court case number 98CR4342.

In August 1999, Mr. LeBere's case was tried to a jury. As part of the evidence presented, Ronnie Archuleta testified that while he and Mr. LeBere were incarcerated together, Mr. LeBere confessed to him. According to Mr. Archuleta, Mr. LeBere said that he met Ms. Richards at a bar, and he became intoxicated. He asked Ms. Richards for a ride home, but instead of going home, they drove to Cheyenne Canyon where he "fucked the bitch" without her consent and strangled her because she could identify him by the phoenix tattoo on his arm. Mr. Archuleta also testified that Mr. LeBere confessed to driving to the carwash and setting fire to the minivan to destroy any bodily fluids he may have left in the minivan.

The jury convicted Mr. LeBere of second-degree murder, a lesser-included offense of first-degree murder, and second-degree arson. Mr. LeBere was sentenced to incarceration of 48 years for the murder conviction and 12 years for the arson conviction, to be served consecutively.

Mr. LeBere appealed his conviction to the Colorado Court of Appeals. While the appeal was pending, Mr. Archuleta recanted his testimony. He said that Mr. LeBere never confessed to him, but instead that the lead detective in Mr. LeBere's case, Detective J.D. Walker, gave him information about the case for the purpose of fabricating his testimony about the confession.

Mr. LeBere also challenged his conviction based on Mr. Archuleta's recantation in a motion for new trial. The Motion was denied by the trial court and the denial was affirmed on direct appeal. Then Mr. LeBere moved for post-conviction relief under Colorado Rule of Criminal Procedure 35(b). This request was denied by the trial court, and the denial was affirmed on direct appeal.

On June 23, 2003, Mr. LeBere filed a *pro se*[2] application for a writ of habeas corpus under 28 U.S.C. § 2254. His case was stayed and later administratively closed while his state post-conviction motion was pending, but it was reopened on July 13, 2009. Mr. LeBere filed an amended application for writ of habeas corpus, alleging that the State of Colorado ("Colorado") suppressed impeachment evidence that Detective Walker conspired with Mr. Archuleta to fabricate a false confession ("impeachment evidence"), and that such action violated *Brady v. Maryland*, 373 U.S. 83 (1963) ("*Brady* claim"). He also alleged that Colorado knowingly elicited Mr. Archuleta's perjured testimony during trial in violation of *Napue v. Illinois*, 360 U.S. 264 (1959) ("*Napue* claim"). Finally, he claimed that he was deprived of his right to counsel. This Court denied Mr. LeBere's *Brady* and *Napue* claims as procedurally barred and denied the right to counsel claim on its merits. Mr. Le Bere appealed. The Tenth Circuit found that the *Brady* and *Napue* claims were not procedurally barred and remanded for them to be determined on the merits.

The Court referred this matter to the Magistrate Judge for a recommendation. On August 8, 2016, the Magistrate Judge issued the instant Recommendation **(# 167)** that the Amended Application be denied. Mr. LeBere filed a timely Objection **(# 168)** to the Recommendation. No response was filed to the Objection.

## ANALYSIS

**A. Standard of Review**

When a magistrate judge issues a recommendation, the parties may file specific, written objections within fourteen days after being served with a copy of the recommendation. 28 U.S.C.

---

[2] Mr. LeBere is no longer proceeding *pro se*. Shortly after filing his application counsel (Jennifer K. Harrison) entered an appearance on his behalf. Over the course of the last several years, he has been represented by multiple attorneys (Laurence W. Demuth, III, Jennifer Sullivan, James L. Volling, Martin S. Chester, and Cicely Miltich).

§ 636(b)(1); Fed. R. Civ. P. 72(b). The district court reviews the portions of the recommendation to which timely and specific objections are made *de novo*. Fed. R. Civ. P. 72(b).

Mr. LeBere brought his Amended Application under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, the standard of review applicable to a particular claim depends upon how that claim was resolved by Colorado courts. *Milton v. Miller*, 744 F.3d 660, 668 (10th Cir. 2014). If a Colorado court adjudicated a claim on the merits, the Colorado court's decision is entitled to deference and can only be overturned under limited circumstances. *See* 28 U.S.C. § 2254(b) & *Williams v. Taylor*, 529 U.S. 420, 429 (2000). If the claim was not adjudicated on its merits and is not procedurally barred, a federal court reviews it *de novo*. *Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004). Mr. LeBere and the Respondents agree that Mr. LeBere's claims should be reviewed *de novo*.[3]

### B. Mr. LeBere's *Napue* Claim

Knowingly eliciting or failing to correct perjured testimony during trial violates due process. *See Napue v. Ill.*, 360 U.S. 264, 269 (1959). To prevail on his *Napue* claim, Mr. LeBere must prove: "(1) a government witness committed perjury, (2) the prosecution knew the testimony to be false, and (3) the testimony was material." *U.S. v. Garcia*, 793 F.3d 1194, 1207 (10th Cir. 2015). As to the second element, a law enforcement officer's knowledge that a witness has committed perjury is not imputed to prosecutors. *Garcia*, 793 F.3d at 1207-08 (citing *Smith v. Sec'y of N.M. Dep't of Corrs.*, 50 F.3d 801 (10th Cir. 1995) (holding that a prosecutor's lack of actual knowledge of a witness' perjury precluded Smith's *Napue* claim)).

---

[3] In conducting its *de novo* review, the Court has carefully and comprehensively reviewed the entire trial transcript, the exhibits introduced at trial, the trial court's file, the parties' respective briefs and exhibits submitted with them, the May 14, 2015 deposition of Detective J.D. Walker, and the September 10, 2015 deposition of Ronnie Archuleta.

Mr. LeBere cannot prove the second element of his *Napue* claim. In footnote 5 of his *Memorandum in Support of Petitioner's Request to Grant Amended Application for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254*, he concedes that he does not have sufficient evidence to prove that the prosecutors in his case actually knew that Mr. Archuleta committed perjury during trial. Therefore, the Court denies Mr. LeBere's *Napue* claim.

### C. Mr. LeBere's *Brady* Claim

Suppression of evidence favorable to an accused that is material to guilt or to punishment violates the accused's right to due process *Brady v. Md.*, 373 U.S. 83, 87 (1963). Evidence favorable to an accused includes exculpatory and impeachment evidence. *U.S. v. Bagley*, 473 U.S. 667, 676 (1985). With a *Brady* claim, a law enforcement officer's knowledge of the existence of exculpatory or impeachment evidence is imputed to the prosecution. *Smith*, 50 F.3d at 831. Therefore, to establish a *Brady* claim, Mr. LeBere must prove: (1) The evidence at issue was favorable to him, either because it is exculpatory, or because it is impeaching; (2) that evidence was suppressed by Colorado, either willfully or inadvertently; and (3) prejudice resulted. *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999). Prejudice satisfying the third element exists when the suppressed evidence is material. *Douglas v. Workman,* 560 F.3d 1156, 1173 (10th Cir. 2009) (quoting *Banks v. Dretke,* 540 U.S. 668, 691 (2004)). Generally, evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the trial result would have been different. A reasonable probability of a different trial result exists when the government's evidentiary suppression undermines confidence in the outcome of the trial. *Kyles v. Whitley,* 514 U.S. 419, 433 (1995).

For purposes of analysis, the Court will assume that Colorado suppressed the impeachment evidence and that had such evidence not been suppressed it would have been used

5

to impeach Mr. Archuleta's testimony. By its nature, impeachment evidence is not substantive evidence, but instead is material only to undermine the credibility of a witness' statements. *U.S. v. Watson*, 766 F.3d 1219, 1244 (10th Cir. 2014). Based on these assumptions, the Court asks two questions: 1) was the verdict dependent upon Mr. Archuleta's testimony, and 2) was the impeachment evidence necessary to raise doubt as to the veracity of Mr. Archuleta's testimony?

### 1. Was the verdict dependent upon Mr. Archuleta's testimony?

Having carefully reviewed the record, the Court is satisfied that the prosecution presented substantial, persuasive evidence, independent of Mr. Archuleta's testimony, from which a jury could have found beyond a reasonable doubt that Mr. LeBere was guilty of charges of second degree murder and arson. Its evidence included the following.

Alfred Holzer, who worked at Crazy Mike's Bar on the night of the incident saw Ms. Richards enter the bar at about 8:00 p.m. She was alone until Mr. LeBere approached her, and the two started talking. By 11:30 p.m., when Mr. Holzer left, she and Mr. LeBere were sitting close together.

Wendy Cobb who also worked at the bar testified that Mr. LeBere was at the bar before Ms. Richards arrived. Mr. LeBere approached Ms. Richards and invited her to play pool. Ms. Cobb testified that Ms. Richards and Mr. LeBere spoke with one another and drank together for the next several hours. As the night progressed, their interactions became more intimate. They sat close together, and Ms. Cobb made an Amaretto Sour drink for them, which they shared with two straws. Ms. Cobb asked Mr. LeBere if he was "going to get lucky" with Ms. Richards, and he responded that he and Ms. Richards talked about having a "one night stand" with each other but that Ms. Richards was engaged and did not believe in having one night stands. Ms. Cobb testified that as the night progressed, Mr. LeBere became increasingly intoxicated. She talked to

him about it, and he told her not to worry because he was going to walk home. At about 12:30 a.m., as he was leaving, he told her that Ms. Richards agreed to give him a ride home, and Ms. Cobb saw Ms. Richards and Mr. LeBere leave the bar together.

According to Ms. Cobb's testimony, the police called her the next day and showed her a picture of Ms. Richards. They told her Ms. Richards had been killed and asked if Ms. Richards had been with anyone at Crazy Mike's Bar. She described Mr. LeBere to them, drew a picture of him, and helped a police artist draw another sketch of him. The drawings portrayed Mr. LeBere as having dark hair that was parted in the middle and came to the middle of his face. Ms. Cobb also identified Mr. LeBere from a security tape from a 7-Eleven located close to where Ms. Richards' body was found.

Officer Carlos Motelongo and Officer Joan Boyer testified that at about 2:00 a.m., they and other officers were on break at the 7-Eleven located at 1011 South 21st Street. At about 2:09 a.m., Tiffany Wyatt, Marlyn Wyatt, David Walker, and Damon Shankling pulled into the parking lot and reported a fire at the carwash. The officers responded immediately. They called for firefighters and, according to dispatch logs, arrived within two minutes of the report. The police officers attempted to extinguish the fire but were unsuccessful.

Jeff Work, a firefighter with the Colorado Springs Fire Department, testified that he was dispatched at about 2:00 a.m. to extinguish the minivan fire at the carwash. He arrived about five minutes later with three other firefighters. At the time they arrived, the minivan was engulfed in flames, but they quickly extinguished the fire. As the smoke cleared, they saw a charred human body in the minivan. It was later identified as Ms. Richards.

A fire investigator, John Schumaker, offered expert testimony. At about 2:30 a.m. on October 16, he was called to investigate the minivan fire. He saw Ms. Richards' body in the

burned minivan. Ms. Richards was face-down with her dress pulled up to her shoulders and her bra displaced so as to expose her breasts, but she was wearing panties. Mr. Schumaker testified that the minivan burned for twenty minutes or less and that it was intentionally set on fire.

Dr. David Bowerman also offered expert testimony. He performed an autopsy on Ms. Richards' body. He opined that she was dead before the minivan was set on fire. Someone had strangled her. He also found spermatozoa in her anal cavity, but lab technicians testified that the amount found was insufficient to use to identify its source.

Catherine Gilsey testified that she arrived home on October 16, 1998 at about 2:05 a.m. She lived at 2158 Broadway in Colorado Springs, which is approximately three-tenths of a mile northwest of the carwash. After arriving, she took her dog outside. At about 2:08 a.m., she heard a car horn blaring from the direction of the carwash. A few minutes later, she heard someone approaching from the direction of the carwash. She saw a man emerge from a service alley. He walked by her in a northward direction. She later identified the man as Mr. LeBere in a photo lineup, in a 7-Eleven surveillance video, and in court.

The 7-Eleven where the police had been contacted about the fire had video surveillance cameras. Video from the cameras showed Mr. LeBere arriving at 2:35 a.m. The 7-Eleven clerk on duty, Gerardo Ruelas-Oroszo, testified that Mr. LeBere bought a sandwich from him and left.

A cab driver, Lowell Howard, testified that he picked Mr. LeBere up from the 7-Eleven at 2:45 a.m. Mr. LeBere acted nervously during the ride. At first, Mr. LeBere asked to be dropped off at a 7-Eleven near Crazy Mike's Bar, then he asked to be dropped off at Jet Wing and Keith Drive, and Mr. Howard complied. The drop off point was one-tenth of a mile from Mr. LeBere's home, which was located at 4735 Keith Court.

Rita Baca, an employee at a barbershop, testified that Mr. LeBere came into the barbershop for a haircut around lunchtime on the day after the incident. His new hairstyle was significantly different than the hairstyle he had while he was with Ms. Richards, and that reflected on his Colorado Identification card, Ms. Cobb's sketch, and the police sketch. Before the haircut, his hair hung to the middle of his face and was parted in the middle. After the haircut, his hair was short on the sides and had no part in the middle.

Finally, there was a recording of an interview that Mr. LeBere had with the police. During the interview, Mr. LeBere admitted that he was with Ms. Richards at Crazy Mike's Bar on October 15, 1998. At first, he said that he had not been in her minivan, but had kissed her goodbye in the bar's parking lot and then walked home. Later, however, he said that he did not kiss her goodnight in the parking lot and that she drove him home in her minivan.

This evidence, even without Mr. Archuleta's testimony, is substantial. Construed favorably to Colorado, it establishes that Mr. LeBere was engaged in intimate behavior with Ms. Richards at Crazy Mike's Bar on the evening of her death. They left Crazy Mike's Bar together in Ms. Richards' minivan. While the minivan was burning, Mr. LeBere was observed walking away from the carwash and was identified at the 7-Eleven located nearby. He called a cab from the 7-Eleven that drove him close to but did not drop him off at his home. On the day after Ms. Richards' death, Mr. LeBere dramatically altered his appearance, arguably to avoid identification. Finally, he lied to the police about to where and with whom he left Crazy Mike's Bar.

This evidence was sufficient for a jury to find, beyond a reasonable doubt, that Mr. LeBere murdered Ms. Richards and set fire to her minivan with her body in it. Indeed, aside from his testimony that Mr. LeBere confessed to sexually assaulting Ms. Richards and killed her

9

because she could identify him (which will be addressed in a moment), Mr. Archuleta's testimony added little to Colorado's case. His testimony as to the exact location where Ms. Richards was killed, a motive for killing her, and a motive for burning the minivan was unnecessary to support the convictions on the charges of second-degree murder[4] or second-degree arson.[5]

### 2. Was the impeachment evidence necessary to raise doubt as to the veracity of Mr. Archuleta's testimony?

Again, review of the record is instructive. Considering the charges, the jury instructions, and sources of evidence, it appears that the jury did not believe Mr. Archuleta's testimony, at least in some respects.[6]

Two[7] alternative first degree murder counts were tried—(1) murder after deliberation[8] and (2) murder committed during, in furtherance of, or in the immediate flight from the

---

[4] The trial court instructed the jury as to the elements of second-degree murder as follows:
The elements of the crime of murder in the second degree are:
  1. That the defendant,
  2. in the State of Colorado, at or about the date and place charged,
  3. knowingly,
  4. caused the death of another person.

[5] The trial court instructed the jury as to the elements of second-degree arson as follows:
The elements of the crime of second degree arson are:
  1. That the defendant,
  2. in the State of Colorado, at or about the date and place charged,
  3. knowingly,
  4. set fire to, burned and caused to be burned,
  5. the property of D.L. Peterson Trust and George Richards, namely, one white 1998 Dodge Caravan,
  6. without that person's consent and,
  7. the damage was one hundred dollars or more.

[6] The trial court instructed the jury that it could "believe all of the testimony of a witness, or part of it, or none of it."

[7] A third count—murder committed during, in furtherance of, or in the immediate flight from the commission or attempted commission of arson—was charged but not tried.

[8] The trial court instructed the jury as to the elements of first-degree murder after deliberation as follows:

commission or attempted commission of sexual assault.[9] As to the second charge, the court instructed the jury that if it did not find that Mr. LeBere either sexually assaulted or attempted to sexually assault[10] Ms. Richards, it must acquit him on the charge. In addition, the court instructed the jury that if it did not find Mr. LeBere guilty of first-degree murder on either of the counts, it, it could find Mr. LeBere guilty of the lesser included crimes of second-degree murder or manslaughter. The jury found Mr. LeBere guilty of the lesser included crime of second-degree murder, acquitting on both first degree counts.

Mr. Archuleta's testimony was essential to both first degree charges. He was the only witness who offered testimony that Mr. LaBere had a motive for killing Ms. Richards (necessary for the first count) and evidence that Mr. LaBere had sexually assaulted Ms. Richards (necessary for the second count). According to Mr. Archuleta, Mr. LeBere confessed that after he left the

---

        1. That the defendant,
        2. in the State of Colorado, at or about the date and place charged,
        3. with intent,
        4. to cause the death of a person other than himself, and
        5. after deliberation,
        6. caused the death of that person or another person.

[9] The trial court instructed the jury as to the elements of first-degree murder during, in furtherance of, or in the immediate flight from the commission or attempted commission of sexual assault as follows:
        1. That the defendant,
        2. in the State of Colorado, at or about the date and place charged,
        3. acting alone,
        4. committed or attempted to commit sexual assault in the first degree, and
        5. in the course of or in furtherance of or in the immediate flight therefrom,
        6. the death of a person, other than one of the participants, is caused by anyone.

[10] The trial court instructed the jury as to the elements for sexual assault in the first degree as follows:
        1. That the defendant,
        2. in the State of Colorado, at or about the date and place charged,
        3. knowingly,
        4. inflicted sexual penetration on a person and
        5. caused submission of that person,
        6. through the actual application of physical force or physical violence.

bar with Ms. Richards, they drove to Cheyenne Canyon where he had sex with her without her consent and strangled her because she could identify him by the phoenix tattoo on his arm.

Mr. LeBere attacked the credibility of Mr. Archuleta's testimony. The jury learned that Mr. Archuleta had been convicted of fraud, forgery, and criminal impersonation. He admitted that he was in danger of being prosecuted as a habitual offender, which would likely result in him spending up to eighteen years in prison, and that he was testifying against Mr. LeBere to avoid it and to receive favorable treatment from prosecutors. Witnesses testified that Mr. Archuleta is a chronic liar. A former deputy police chief testified that after Mr. Archuleta had worked as a confidential informant, the Colorado Springs vice and narcotics unit decided to stop using him because he made a false report, was unreliable, and did not tell the truth. Mr. LeBere also showed that Mr. Archuleta could have gleaned the information he testified to from local newspaper reports that predated Mr. LeBere's alleged confession.

Apparently, without the impeachment evidence at issue, Mr. LeBere successfully impeached Mr. Archuleta's testimony. In acquitting Mr. LaBere on both first degree murder counts, the jury apparently rejected Mr. Archuleta's testimony as to motive and as to sexual assault and instead found him guilty of second degree murder.

In sum, the verdict is sufficiently supported by evidence other than Mr. Archuleta's testimony, and it appears that the jury did not find his testimony to be credible in significant respects. Therefore, if there was a violation of *Brady v. Maryland.*, 373 U.S. 83, 87 (1963), the Court is satisfied that the suppression of the impeachment evidence did not result in a denial of due process to Mr. LeBere.

## **CONCLUSION**

Mr. LeBere is not entitled to relief on his *Napue* or *Brady* claims. There is no evidence that the prosecutor in his case knew that Mr. Archuleta committed perjury when he testified. Further, even if Colorado suppressed impeachment evidence that Detective Walker conspired with Mr. Archuleta to fabricate a false confession, it does not undermine confidence in the jury's verdict.

For the foregoing reasons, the Court **OVERRULES** Mr. LeBere's Objection **(# 168)** and **ADOPTS** the Magistrates Judge's August 8, 2016 Recommendation **(# 167)**, albeit on different grounds, that the Applicant's Amended Application for Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 **(# 62)** be **DENIED**. The Clerk of the Court shall enter judgment and close this case.

Dated this 28th day of November, 2016

**BY THE COURT:**

*[signature: Marcia S. Krieger]*

Marcia S. Krieger
Chief United States District Judge